**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **PEGGY L. BROWN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | **Case No. 1:05CV157 JCH (LMB)** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying Peggy L. Brown's applications for a Period of Disability and Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income benefits under Title XVI of the Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of Complaint. (Document Number 13). Defendant has filed a Brief in Support of the Answer. (Doc. No. 14).

**Procedural History**

On January 15, 2004, plaintiff filed her applications for Disability Insurance Benefits and Supplemental Security Income, claiming that she became unable to work due to her disabling condition on December 19, 2003. (Tr. 63-65, 109-11). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an

Administrative Law Judge (ALJ), dated April 4, 2005. (Tr. 53-57, 69; 10-17). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration (SSA), which was denied on August 12, 2005. (Tr. 5-6, 2-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481 (2003).

## Evidence Before the ALJ

### A.     ALJ Hearing

Plaintiff's administrative hearing was held on November 30, 2004. (Tr. 20). Plaintiff was present and was represented by counsel. (Id.). The ALJ began by admitting the exhibits into the record. (Tr. 21). The ALJ indicated that he would leave the record open for 30 days, so that plaintiff could submit additional records. (Id.).

The ALJ then examined plaintiff, who testified that she was 56 years of age and obtained a GED. (Id.). Plaintiff stated that she was five-feet, two-inches tall, weighed 275 pounds, and was right-handed. (Tr. 22). Plaintiff testified that she was not working at the time of the hearing, and that she last worked in December 2003 for T.G. Missouri, a car part manufacturer. (Id.). Plaintiff stated that she worked for T.G. Missouri for six years running machines, inspecting items, and assembling parts. (Id.). Plaintiff testified that she performed her job at T.G. Missouri while standing at a table, and that there were no duties that she could perform while sitting down. (Tr. 25).

Plaintiff testified that before she worked at T.G. Missouri, she worked at Proctor and Gamble through Work Force. (Id.). Plaintiff stated that her position at Proctor and Gamble involved inserting coupons in diapers. (Id.). Plaintiff testified that she also worked as a packer at

Proctor and Gamble, which was a physically demanding position that required her to place large items on a machine. (Id.). Plaintiff explained that she would alternate between inserting and packing during her shifts at Proctor and Gamble. (Tr. 25-26). Plaintiff testified that she worked at Proctor and Gamble for a about a year. (Tr. 26). Plaintiff stated that she worked at different cites through Manpower prior to working at Proctor and Gamble. (Id.). Plaintiff testified that she stopped working for Manpower when she was offered a permanent job at T.G. Missouri. (Tr. 27). Plaintiff testified that she stopped working for T.G. Missouri because she could no longer perform her duties due to pain in her hands, wrists, and fingers from carpal tunnel syndrome.[1] (Tr. 28).

Plaintiff stated that she underwent surgery on both hands in 2002. (Id.). Plaintiff testified that her hands first started bothering her in 2001. (Id.). Plaintiff stated that she underwent Cortisone shots to her hands prior to the surgery. (Tr. 29). Plaintiff testified that Dr. David Deisher performed the carpal tunnel release surgery in Cape Girardeau. (Id.). Plaintiff stated that she experienced pain in her hands, fingers, wrists, and arms, up to her elbow. (Id.). Plaintiff testified that she also experienced pain in her shoulders, which her doctors attributed to the carpal tunnel syndrome. (Tr. 30).

Plaintiff stated that the surgery did not provide relief, as she could not do anything repetitively after the surgery without experiencing constant pain. (Id.). Plaintiff testified that she still could not manipulate things after the surgery. (Tr. 31). Plaintiff stated that she cannot sweep, mop, or operate a vacuum cleaner because she experiences too much pain in her hands.

---

[1]The most common nerve entrapment, characterized by nocturnal hand paresthesia and pain, and sometimes sensory loss and wasting in the median hand distribution. Stedman's Medical Dictionary, 1749 (27th Ed. 2000).

(Id.).  Plaintiff testified that her youngest daughter helps her with house work.  (Id.).

Plaintiff testified that she suffers from severe pain in her back and hips, which causes her to experience difficulty sitting, standing, and bending.  (Id.).  Plaintiff stated that she has had these problems since 2000.  (Tr. 33).  Plaintiff testified that she did not suffer an injury to her back, but the problems developed as she got older.  (Id.).  Plaintiff stated that she underwent x-rays when she first starting taking Vioxx[2] in 2000.  (Tr. 34).

Plaintiff stated that she also suffers from depression.  (Id.).  Plaintiff stated that she is being treated by a psychiatrist, Dr. Jay Liss, in St. Louis.  (Tr. 32).  Plaintiff testified that she also sees a counselor, Candace Fair, every few weeks for her depression and anxiety.  (Id.).  Plaintiff stated that she does not feel comfortable around people and is nervous and anxious.  (Tr. 33).

Plaintiff testified that she experiences chest pain, which is being treated by Dr. Eugenio, her regular physician.  (Tr. 31-32).  Plaintiff stated that she was scheduled to undergo testing the week after the hearing to diagnose her chest pain.  (Tr. 34).  Plaintiff testified that Dr. Eugenio told her that the chest pain could be caused by her anxiety.  (Id.).

Plaintiff testified that she lives alone.  (Tr. 35).  Plaintiff stated that she has two daughters and five grandchildren.  (Id.).  Plaintiff testified that on an average day, she will "piddle around the house."  (Id.).  Plaintiff stated that she cannot stand or sit for longer than 15 to 20 minutes. (Id.).  Plaintiff testified that she cleans up after herself, watches television, reads, and talks on the telephone.  (Tr. 39).  Plaintiff stated that she especially enjoys reading the Bible.  (Id.).  Plaintiff stated that she eats mostly fast food and only cooks meals that can be heated in the microwave.

---

[2]Vioxx is indicated for the management of acute pain associated with arthritis.  See Physician's Desk Reference (PDR), 2172 (59th Ed. 2005).

(Id.).  Plaintiff testified that she tries to wash dishes, although she does not vacuum, sweep, or do laundry.  (Tr. 36).  Plaintiff stated that her youngest daughter cleans her home.  (Id.).  Plaintiff testified that her sources of income are her 401K funds, her income tax return funds, and the financial assistance that her sister provides.  (Id.).  Plaintiff testified that she receives Medicaid benefits.  (Id.).  Plaintiff stated that her youngest daughter does most of the grocery shopping for her, although she occasionally goes to the store to purchase a few items.  (Tr. 37).  Plaintiff testified that she drives to her doctor appointments.  (Id.).  Plaintiff stated that she does not like to go shopping because she does not like being around people.  (Id.).

Plaintiff testified that she is unable to do heavy lifting.  (Id.).  Plaintiff stated that she experiences back and hip pain when she rides in the car.  (Tr. 38).  Plaintiff testified that she can be on her feet in the grocery store for 40 to 45 minutes.  (Id.).  Plaintiff stated that she experiences pain in her lower back and her hip.  (Tr. 39).

 Plaintiff testified that she took Vioxx until it was taken off the market.  (Tr. 40).  Plaintiff stated that she currently takes Naproxen[3] and Darvocet.[4]  (Id.).  Plaintiff testified that she also takes blood pressure medication and Zoloft.[5]  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that she attempted to work in a sheltered workshop but she was not hired.  (Tr. 41).  Plaintiff stated that she occasionally uses a cane for ambulation.  (Id.).  Plaintiff testified that the cane was not prescribed by her doctor.  (Id.).  Plaintiff stated that she experiences difficulty sleeping.  (Id.).  Plaintiff testified that she was

---

[3]Naproxen is indicated for the treatment of arthritis.  See PDR at 2875.

[4]Darvocet is indicated for the relief of mild to moderate pain.  See PDR at 402.

[5]Zoloft is indicated for the treatment of depression.  See PDR at 2682.

prescribed Zoloft, which helps her sleep. (Id.). Plaintiff stated that she wakes up frequently during the night due to the pain in her hands, hip, and back. (Tr. 42). Plaintiff testified that she experiences chest pain a couple times a week. (Id.).

## B.     Relevant Medical Records

### 1.     Records Before the ALJ

The record reveals that plaintiff saw Romeo R. Eugenio, M.D., for various complaints, including arthritis,[6] pain in her hips and knees, carpal tunnel syndrome in both hands, and chest pain, from February 2002 to October 2004. (Tr. 177, 190). On June 8, 2004, Dr. Eugenio diagnosed plaintiff with multiple joint osteoarthritis.[7] (Tr. 179). Dr. Eugenio prescribed weight loss, Vioxx, and Hydrochlorothiazide.[8] (Tr. 177). On July 13, 2004, August 23, 2004, and September 24, 2004, Dr. Eugenio prescribed Darvocet. (Id.).

Plaintiff presented to David M. Deisher, M.D. at Heartland Plastic and Hand Surgery on May 13, 2002, for evaluation of carpal tunnel syndrome. (Tr. 221). Plaintiff complained of increasing pain, numbness, and tingling in the wrist, that had been present for about a year. (Id.). After a physical examination, Dr. Deisher diagnosed plaintiff with carpal tunnel syndrome. (Id.). Dr. Deisher recommended conservative therapy, limited repetitive activity, anti-inflammatories, and nerve conduction studies. (Id.). Plaintiff underwent nerve conduction studies on May 21, 2002, which revealed moderate bilateral carpal tunnel syndrome, with the left greater than the

---

[6]Inflammation of a joint. Stedman's at 149.

[7]Arthritis characterized by erosion of articular cartilage, which causes pain and loss of function. See Stedman's at 1282.

[8]Hydrochlorothiazide is indicated for the treatment of hypertension. See PDR at 2682.

right. (Tr. 222). Plaintiff saw Dr. Deisher on May 22, 2002, for a follow-up regarding her carpal tunnel syndrome. (Tr. 220). Dr. Deisher concluded that plaintiff would benefit from surgery. (Id.). Surgery was scheduled. (Id.).

Plaintiff underwent right carpal tunnel release on June 19, 2002. (Tr. 219). On June 21, 2002, and July 1, 2002, Dr. Deisher noted that plaintiff was doing well following surgery. (Tr. 217, 213). On July 17, 2002, Dr. Deisher stated that plaintiff was ready to return to work. (Tr. 212). Dr. Deisher noted that plaintiff had excellent sensation and good grip strength. (Id.). Dr. Deisher stated that plaintiff could return to work with no limitations. (Id.). On August 7, 2002, plaintiff reported that she had "no complaints whatsoever" with regard to her right hand. (Tr. 211). Dr. Deisher noted that surgery may be necessary on plaintiff's left hand. (Id.). On August 30, 2002, plaintiff reported pain and weakness in her left hand. (Tr. 210). Dr. Deisher recommended surgery on the left hand. (Id.).

Plaintiff underwent left carpal tunnel release on September 26, 2002. (Tr. 209). In a letter dated December 31, 2002, Dr. Deisher stated that plaintiff had reached maximum medical improvement. (Tr. 207). Dr. Deisher expressed the opinion that plaintiff had a four percent permanent partial disability rating in her left hand, and a five percent permanent partial disability rating in her right hand. (Id.).

Plaintiff saw Dr. Deisher on February 12, 2003, for evaluation of elbow problems. (Tr. 206). Dr. Deisher's assessment was elbow strain, which may be early cubital tunnel syndrome.[9] (Id.). Dr. Deisher recommended conservative therapy, with limited repetitive activities, no lifting

---

[9]A group of symptoms that develop from compression of the ulnar nerve within the cubital tunnel at the elbow. See Stedman's at 1751.

limits, and anti-inflammatories. (Id.). Plaintiff saw Dr. Deisher for a follow-up on March 7, 2003. (Tr. 205). Dr. Deisher's assessment was elbow strain, early cubital tunnel. (Id.). Plaintiff reported that she could probably perform her job. (Id.). Dr. Deisher released plaintiff to work with no limitations. (Id.). On April 7, 2003, plaintiff reported that she had been performing her job normally. (Tr. 204). Upon physical examination, Dr. Deisher found some tenderness around the elbow, with normal flexion and extension. (Id.). Plaintiff's range of motion of the left and right wrists was normal. (Id.). Dr. Deisher recommended simple over-the-counter anti-inflammatories. (Id.). Dr. Deisher released plaintiff to work with no limitations and discharged her from his care. (Id.). Dr. Deisher noted that his opinion regarding plaintiff's permanent partial impairment ratings had not changed. (Id.).

Plaintiff saw Lori A. Moyers, D.O., for a consultative examination on March 20, 2004. (Tr. 180-83). Dr. Moyers' impression was bilateral carpal tunnel, hypertension, morbid obesity, and osteoarthritis. (Tr. 182). Dr. Moyers expressed the opinion that plaintiff's impairments do not preclude employment. (Id.). Dr. Moyers stated that plaintiff's participation in the examination was "very poor." (Id.). Dr. Moyers found no marked disabilities secondary to osteoarthritis in her back, hips, legs, and feet. (Id.). Plaintiff's gait was slow and she experienced difficulty with heel and toe walking, secondary to pain. (Id.). Plaintiff had some mild decreased sensation in the bilateral upper extremities, but no muscle atrophy, spasm, or tenderness. (Id.). Plaintiff exhibited good fine motor control. (Id.). Dr. Moyers expressed the opinion that plaintiff could sit for an unlimited duration, stand 6 hours a day, walk 6 hours a day, lift and carry up to 20 pounds for 4 hours a day, and had no limitations handling objects, hearing, speaking, or traveling. (Tr. 182-83).

Donald E. Edwards, M.D., a non-examining state agency physician, completed a Physical Residual Functional Capacity Assessment on April 2, 2004. (Tr. 125-31). Dr. Edwards expressed the opinion that plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk about 6 hours in an 8-hour workday, sit a total of 6 hours in an 8-hour workday, and push or pull an unlimited amount. (Tr. 125). Dr. Edwards found that plaintiff could occasionally climb ladders, ropes and scaffolds, and could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 126). Dr. Edwards found no manipulative, visual, communicative, or environmental limitations. (Tr. 127-28).

Plaintiff underwent counseling at Perry County Memorial Hospital Counseling Center on August 24, 2004. (Tr. 161-66). Plaintiff reported that her husband was murdered in 1979 by an ex-boyfriend and that she has been unable to let it go. (Tr. 161). Plaintiff stated that she still feels guilt and fear as a result of the murder. (Id.). Plaintiff also reported sadness, feelings of failure, loss of pleasure, self dislike, suicidal thoughts, crying spells, agitation, loss of interest, feelings of worthlessness, irritability, fatigue, and concentration difficulties. (Tr. 163-64). Jay Liss, M.D. prescribed Zoloft. (Tr. 162). On October 12, 2004, plaintiff reported that the Zoloft had been effective in controlling her symptoms. (Tr. 160).

Plaintiff presented to Perry County Memorial Hospital on October 9, 2004, complaining of chest pain. (Tr. 169). Plaintiff underwent lateral chest x-rays, which were negative. (Tr. 171). Plaintiff also underwent an EKG,[10] which was normal. (Tr. 173).

Plaintiff saw B. Beck, M.D., on November 8, 2004, upon the referral of Dr. Eugenio, for

---

[10]Abbreviation for electrocardiogram, which is the graphic record of the heart's integrated action currents. See Stedman's at 572, 573.

treatment of her chest pain.  (Tr. 156-158).  Dr. Beck noted that plaintiff was seen in the emergency room the prior month and was sent home after a normal EKG and no evidence of ischemic concerns.  (Tr. 156).  Plaintiff reported sharp stabbing chest discomfort over her left breast, which radiates to her left upper extremity as well as neck.  (Id.).  Dr. Beck noted that the pain abates on its own and is not related to any type of exertion.  (Id.).  Dr. Beck's impression was "atypical chest discomfort."  (Tr. 157).  Dr. Beck recommended that plaintiff undergo testing.  (Tr. 158).  Plaintiff underwent testing on December 1, 2004, which revealed no abnormalities.  (Tr. 154).

### 2.    Records Adduced After the ALJ's Decision

Dr. Eugenio completed a Medical Source Statement on April 27, 2005.  (Pl's Attachment 2).  Dr. Eugenio expressed the opinion that plaintiff could frequently lift or carry 10 pounds, occasionally lift or carry 15 pounds, stand or walk continuously for 15 minutes, stand or walk for a total of 2 hours in an 8-hour workday, sit continuously for 30 minutes, sit for a total of 2 hours in an 8-hour workday, and push or pull for a limited duration.  (Id.).  Dr. Eugenio found that plaintiff could frequently reach and feel; occasionally balance, stoop, handle, finger, and grip; and never climb, kneel, crouch, or crawl.  (Id.).  In addition, Dr. Eugenio expressed the opinion that plaintiff should avoid moderate exposure to extreme weather, vibrations and hazards; and should avoid any exposure to dust or fumes and heights.  (Id.).  Dr. Eugenio stated that plaintiff needs to lie down or recline four to six times for fifteen to twenty minutes in a typical eight-hour workday. (Id.).  Finally, Dr. Eugenio noted that plaintiff's medications cause dizziness and fatigue.  (Id.).

On May 25, 2005, Candace D. Fair, LCSW submitted a letter to plaintiff's attorney, in which she stated that she had been seeing plaintiff in out-patient psychotherapy since August of

2004. (Pl's Attach. 1). Ms. Fair indicated that plaintiff has been diagnosed with Generalized

Anxiety Disorder[11] and Post-traumatic Stress Disorder (PTSD).[12] (Id.). Ms. Fair stated that

plaintiff has been coping with symptoms of PTSD since her husband's murder in 1979, and

experienced an increase in anxiety and depression beginning about two years ago. (Id.). She

indicated that plaintiff experiences frequent and persistent episodes of anxiety, especially in public

places. (Id.). Ms. Fair stated that plaintiff's anxiety and PTSD significantly limit her ability to

concentrate, problem solve, and perform tasks consistently. (Id.). Ms. Fair indicated that she

strongly supported plaintiff's receiving disability benefits. (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1.    The claimant meets the nondisability requirements for a Period of Disability and
       Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act
       and is insured for benefits through the date of this decision.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset
       of disability.

3.    The claimant has bilateral carpal tunnel syndrome, elbow pain, depression, and
       arthritis in her back, hips, feet, and legs. This combination of impairments is
       severe.

4.    These medically determinable impairments do not meet or medically equal one of
       the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

---

[11]A psychological disorder in which anxiety or morbid fear and dread accompanied by
autonomic changes are prominent features. See Stedman's at 526.

[12]Development of characteristic symptoms following a psychologically traumatic event
that is generally outside the range of usual human experience; symptoms include numbed
responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and
dysphoria. See Stedman's at 527.

5.       The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.       The claimant's impairments preclude occasional lifting and carrying of more than 20 pounds, frequently lifting and carrying more than 10 pounds; standing and walking more than six hours out of an eight-hour day, and sitting more than six hours out of an eight-hour day. She has a mild compromised use of [] both her hands and a moderate compromise of her grip strength in both hands.

7.       The claimant's past relevant work as a diaper packager, as she described it, involved no more than light exertion.

8.       The claimant's past relevant work as a diaper machine tender is not precluded by her residual functional capacity (20 CFR § 404.1565).

9.       The claimant's medically determinable impairments do not prevent the claimant from performing her past relevant work as an assembler.

10.      The claimant did not sustain her burden of proving that she cannot perform her past relevant work.

11.      The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 16).

The ALJ's final decision reads as follows:

It is the decision of the Administrative Law Judge that, based on the application filed on January 15, 2004, the claimant is not entitled to a Period of Disability or Disability Insurance Benefits under Sections 216(I) and 223, respectively, of the Social Security Act.

It is further the decision of the Administrative Law Judge that, based on the application filed on January 15, 2004, the claimant is not eligible for Supplemental Security Income payments under Sections 1602 and 1614(a)(3)(A) of the Social Security Act.

(Tr. 17).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

### B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

- 13 -

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied.

See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.

 See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758 (2000). Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a, 416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must

- 15 -

indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3); Pratt, 956 F.2d at 834-35; Jones v. Callahan, 122 F.3d 1148, 1153 n.5 (8th Cir. 1997).

## C.     Plaintiff's Claims

Plaintiff raises three claims on appeal of the decision of the Commissioner. Plaintiff first argues that the ALJ erred in discrediting plaintiff's subjective complaints of pain and limitations. Plaintiff next argues that the ALJ erred in finding plaintiff's mental disorder to be non-severe. Plaintiff finally argues that the ALJ erred in formulating plaintiff's residual functional capacity. The undersigned will address each claim in turn, beginning with plaintiff's claim regarding her mental impairment.

## 1.   Mental Impairment

Plaintiff contends that the ALJ erred in finding at step two of the sequential evaluation that her mental impairment was not severe.  The ALJ, however, stated that plaintiff's combination of "bilateral carpal tunnel syndrome, elbow pain, *depression*, and arthritis in her back, hips, feet, and legs" was "severe."  (Tr. 13, 16) (emphasis added).  Thus, plaintiff's argument is without merit.  Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 2.   Credibility Analysis

Plaintiff argues that the ALJ erroneously found plaintiff's subjective complaints of pain and limitation not credible.  Defendant contends that the ALJ's credibility determination is supported by substantial evidence on the record as a whole.

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d at 1320, 1322 (8th Cir. 1984) (quoting settlement agreement between Department of Justice and class action plaintiffs who alleged that the Secretary of Health and Human Services unlawfully required objective medical evidence to fully corroborate subjective complaints).  Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors."  Kelley, 133 F.3d at 588.  Polaski requires the consideration of:  (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3)

aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benksin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent her from working are credible.

In his opinion, the ALJ specifically cited the relevant Polaski factors. (Tr. 14). The ALJ then properly pointed out Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first stated that the medical evidence does not support plaintiff's subjective complaints. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ first pointed to Dr. Deisher's findings that plaintiff had reached maximum medical improvement shortly after her carpal tunnel syndrome surgeries, and could return to work with normal limitations. (Tr. 204, 207, 212). The ALJ also noted that Dr. Deisher found no objective medical basis for plaintiff's elbow pain. (Tr. 204-05). The ALJ pointed out that plaintiff has full strength in each arm and normal range of motion in her upper extremities. (Tr. 204).

With regard to plaintiff's osteoarthritis, the ALJ stated that plaintiff's trips to the doctor for these symptoms were infrequent. The ALJ also pointed out that Dr. Moyers indicated at plaintiff's consultative examination that plaintiff had no marked disabilities from her osteoarthritis. (Tr. 182). In fact, Dr. Moyers commented repeatedly that plaintiff's participation in the examination was "very poor." (Tr. 182). Finally, the ALJ noted that plaintiff failed to seek regular medical treatment for her depression until August of 2004, and that the medical record does not document any ongoing treatment sought and received for depression. The ALJ concluded that plaintiff's lack of treatment for her depression seriously detracts from her credibility. The fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability. See Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997).

The ALJ next states that after her carpal tunnel surgeries, plaintiff returned to a job that required demanding manipulative operations and worked at that position from August of 2002 to December of 2003. The ALJ notes that the fact that plaintiff's carpal tunnel syndrome did not prevent her from working at that time strongly suggests that it would not currently prevent her from working. The fact that a claimant worked successfully for a significant period of time with his or her impairments is inconsistent with a claim of disabling pain. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992).

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's

complaints of disabling pain are sufficient, and his finding that plaintiff's complaints are not credible is supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

**3.** **Residual Functional Capacity**

Plaintiff next argues that the ALJ erred in assessing her residual functional capacity. Specifically, plaintiff contends that the ALJ arbitrarily assessed a residual functional capacity that is not based on any medical evidence.  Defendant contends that the ALJ properly formulated plaintiff's residual functional capacity based upon all the credible evidence of record.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'"  Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)).  Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

After assessing plaintiff's credibility, the ALJ made the following determination regarding plaintiff's residual functional capacity:

> [g]iving the claimant the benefit of the doubt, the claimant is found credible to the extent of and the claimant's residual functional capacity and limitations are found to be light work.  The claimant's impairments preclude occasional lifting and carrying of more than 20 pounds, frequently lifting and carrying more than 10 pounds; standing and walking more than six hours out of an eight-hour day, and sitting more than six hours out of an eight-hour day.  She has a mild compromised use of both of her hands and a moderate

- 20 -

compromise of her grip strength in both hands.

(Tr. 15). Contrary to plaintiff's claim that the ALJ's residual functional capacity determination was arbitrary and not based on any medical evidence, the ALJ assessed a residual functional capacity that is consistent with the record as a whole as it was presented to him.

As previously discussed with regard to the ALJ's credibility analysis, Dr. Deisher found that plaintiff had reached maximum medical improvement and could return to work with no limitations. (Tr. 204, 207, 212). Dr. Liss noted that the Zoloft had been effective in controlling plaintiff's psychiatric symptoms. (Tr. 160). After seeing plaintiff for a consultative examination, Dr. Moyers expressed the opinion that plaintiff's impairments do not preclude employment and that plaintiff has no marked disabilities secondary to osteoarthritis in her back, hips, legs, and feet. (Tr. 182). Dr. Moyers found that plaintiff could sit for an unlimited duration, stand 6 hours a day, walk 6 hours a day, lift and carry up to 20 pounds for 4 hours a day, and had no limitations handling objects, hearing, speaking, or traveling. (Tr. 182-83).

Dr. Edwards, the state agency physician, expressed the opinion that plaintiff could occasionally lift or carry 50 pounds, frequently lift or carry 25 pounds, stand or walk about 6 hours in an 8-hour workday, sit a total of 6 hours in an 8-hour workday, and push or pull an unlimited amount. (Tr. 125). Dr. Edwards found that plaintiff could occasionally climb ladders, ropes and scaffolds, and could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 126). Dr. Edwards found no manipulative, visual, communicative, or environmental limitations. (Tr. 127-28).

The residual functional capacity formulated by the ALJ is consistent with the medical evidence. The ALJ's residual functional capacity is actually more restrictive than that of the state

agency physician, Dr. Edwards, who found that plaintiff was capable of lifting 50 pounds occasionally and 25 pounds frequently. (Tr. 125). The ALJ's residual functional capacity assessment is consistent with that of Dr. Moyers, the consulting examining physician. Notably, at the time the ALJ rendered his decision, none of plaintiff's treating physicians had imposed any restrictions on plaintiff. In light of the evidence in the record at the time of the ALJ's decision, the undersigned cannot fault the residual functional capacity determination of the ALJ.

## 4. __New Evidence__

If the only evidence before the court were that presented to the ALJ, then the undersigned would recommend that the Commissioner's finding that plaintiff is not disabled be affirmed. Plaintiff, however, attached to her Brief in Support of her Complaint a Medical Source Statement from her treating physician, Dr. Eugenio, and a letter from her counselor, Candace D. Fair, LCSW, both dated after the ALJ rendered his decision. (Doc. No. 13, Exhibits 1, 2). Although plaintiff indicates in her Brief that she submitted this new evidence to the Appeals Council in May 2005, the Appeals Council does not acknowledge receipt of the evidence in its decision. (Doc. No. 13 at 9; Tr. 2-4). Plaintiff's counsel states that the evidence "for whatever reason was never associated with the file once it was transferred to the Appeals Counsel." (Pl's Brief at p. 9). Plaintiff's counsel further states that she was not aware of its omission until a review of the transcript was made. (See id.).

In his Medical Source Statement dated April 27, 2005, Dr. Eugenio expressed the opinion that plaintiff can lift or carry 10 pounds frequently and 15 pounds occasionally; can stand or walk continuously for 15 minutes and can stand or walk a total of 2 hours in an 8-hour workday; can sit continuously for 30 minutes, and can sit a total of 2 hours in an 8-hour workday; and is limited in

her ability to push or pull.  Dr. Eugenio found that plaintiff can never climb, kneel, crouch, or crawl, and can occasionally balance, stoop handle, finger, and grip.  He recommended that plaintiff avoid any exposure to dust or fumes and heights, and avoid moderate exposure to extreme temperature, weather, vibrations, and hazards.  Dr. Eugenio stated that plaintiff has the need to lie down or recline 4 to 6 times a day for 15 to 20 minutes at a time.  Finally, Dr. Eugenio indicated that plaintiff's medications cause plaintiff to experience dizziness and fatigue.

In her letter dated May 25, 2005, Ms. Fair indicated that she, along with psychiatrist Jay Liss, had been seeing plaintiff for psychotherapy since August of 2004.  Ms. Fair stated that plaintiff's diagnosis is Generalized Anxiety Disorder and Post-traumatic Stress Disorder.  Ms. Fair reported that plaintiff began to experience an increase in anxiety and depression beginning two years ago.  Ms. Fair stated that plaintiff experiences frequent and persistent episodes of anxiety, which can be triggered by many things.  Ms. Fair indicated that plaintiff experiences increased anxiety in public places.  Ms. Fair stated that plaintiff finds it difficult to concentrate or function competently when she is anxious, and that the anxiety "overrides her ability to act with independent judgment and competence."  Ms. Fair concluded that plaintiff's anxiety and post-traumatic stress disorder significantly limit her ability to concentrate, problem solve, and perform tasks consistently.  Ms. Fair stated that she "strongly support[s]" plaintiff's receiving disability benefits.

Pursuant to sentence six of 42 U.S.C. § 405 (g), remand for consideration of new evidence is proper when the new evidence is "material and that there is good cause for the failure to incorporate such evidence in the record in a prior proceeding."  42 U.S.C. § 405 (g).  See Gallus v. Callahan, 117 F.3d 1061, 1063 n.5 (8th Cir. 1997).  "To be material, new evidence must

be non-cumulative, relevant, and probative of the claimant's condition for the time period for which the benefits were denied, and there must be a reasonable likelihood that it would have changed the [Commissioner's] determination." Hinchey v. Shalala, 29 F.3d 428, 432-33 (8th Cir. 1994).

It appears that this evidence of plaintiff's physical and mental impairments may be probative of plaintiff's condition at the time of the ALJ's opinion, and, accordingly, it should be considered by the Commissioner. Dr. Eugenio does not state directly that his opinion applies to the relevant time period, although it was rendered less than a month after the ALJ's decision. The functional limitations imposed by Dr. Eugenio are significantly more restrictive than the residual functional capacity assessed by the ALJ. Dr. Eugenio's opinion regarding plaintiff's functional restrictions is particularly relevant as he is plaintiff's treating physician. The only opinions available to the ALJ at the time he rendered his decision were those of consulting physicians. Similarly, Ms. Fair's letter, although dated almost two months after the ALJ's decision, indicates that plaintiff's condition began to worsen two years prior to that time. Ms. Fair's letter reveals diagnoses that were not considered by the ALJ, namely Generalized Anxiety Disorder and Post-traumatic Stress Disorder. Ms. Fair's letter also constitutes the only evidence addressing the severity of plaintiff's mental impairments and their effect on plaintiff's ability to perform work-related functions.

The new evidence, therefore, appears to be material. Because the evidence was not adduced until after the ALJ rendered his decision, good cause exists for the failure to include this evidence in the record before the ALJ. If this evidence were before the ALJ, there is a reasonable possibility that the ALJ's determination may have been different. The undersigned finds that

evidence of plaintiff's physical and mental condition should be further developed and that evidence resulting from further development may or may not support the conclusions of Dr. Eugenio and Ms. Fair. The conclusions of Dr. Eugenio and Ms. Fair are couched in strong terms. They should be examined; however, there may be other evidence to the contrary that may come to light. Accordingly, the undersigned recommends that this matter be remanded to the ALJ to consider not only the new evidence from plaintiff's treating physician, Dr. Eugenio, and plaintiff's counselor, Ms. Fair, but such further evidence as may be developed in aid of the ALJ's further reconsideration of plaintiff's residual functional capacity based upon the record as a whole.

**RECOMMENDATION**

**IT IS HEREBY RECOMMENDED** that this case be **remanded** to the Commissioner for further proceedings pursuant to sentence six of 42 U.S.C. §405 (g) for those reasons set forth in this report and recommendation.

The parties are advised that they have eleven (11) days, until February 19, 2007, in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this  6th   day of  February, 2007.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE